J-S29032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.L.H.R., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.C.J.B., MOTHER | : : : : : : : | |
| | : | No. 3794 EDA 2017 |

Appeal from the Order October 25, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-000369-2014,
CP-51-AP-0000610-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: L.K.S.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.C.J.B., MOTHER | : : : : : | |
| | : | No. 3804 EDA 2017 |

Appeal from the Order October 25, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-000369-2014,
CP-51-AP-0000611-2017

BEFORE:   PANELLA, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MAY 18, 2018**

Appellant, N.C.J.B. ("Mother"), files these consolidated appeals from the

orders entered on October 25, 2017, in the Philadelphia County Court of

Common Pleas, granting the petition of the Department of Human Services

("DHS") and involuntarily terminating her parental rights to two of her minor,

dependent children, N.L.H.R., a female born in March of 2011, and L.K.S.R.,

_____
*   Former Justice specially assigned to the Superior Court.

a male born in March of 2008 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] After careful review, we affirm the trial court's termination orders.

Since 2014, DHS has been involved in the supervision of Mother's four children: N.L.H.R, L.K.S.R., and the Children's two older siblings ("Sibling 1" and "Sibling 2").[2] On January 30, 2014, DHS received a Child Protective Services Report that Sibling 1 arrived at school with an abrasion over his right eye and a swollen, red left cheek. Sibling 1 indicated that he sustained these injuries when Mother hit him in the face with an extension cord. School personnel also noted that Sibling 1 and Sibling 2 had poor hygiene and would often come to school smelling of urine and other foul odors. School personnel had on several occasions changed Sibling 1 and Sibling 2's clothes and washed them due to their poor hygiene; when Mother was made aware of this issue, school personnel noted that she did not appear concerned about her children's hygiene.[3] DHS Exhibit A, at 1.

Upon investigation of this report, DHS personnel observed various scars on Sibling 1's body at various stages of healing. Mother initially claimed the

---

[1] On the same day, the trial court also terminated the parental rights of the Children's father, R.R. ("Father"), who has been incarcerated since March 13, 2013. Father has not filed an appeal and is not a party to the instant appeal.

[2] While Sibling 1 and Sibling 2 are also in DHS care, their goal is Permanent Legal Custody. The status of Mother's parental rights to Sibling 1 and Sibling 2 are not at issue in this case.

[3] There is nothing in the record to suggest that school authorities reported the previous instances of the Children's poor hygiene.

scars were from a recent surgery, but could not provide any additional information as to the type of surgery or the hospital where the alleged procedure occurred. Subsequently thereafter, on February 12, 2014, DHS indicated the report, obtained an Order of Protective Custody (OPC) for Sibling 1, and placed him in foster care.

Less than a month later, on March 10, 2014, DHS received another report indicating that Sibling 2 arrived at school with an abrasion on the right side of his face, which appeared to have occurred between March 8, 2014, and March 10, 2014. Sibling 2 told school staff that Mother had caused the injury with a knife and had "stomped on his face." DHS Exhibit A, at 2. When DHS questioned Mother about the incident, she first told them that Sibling 2 was injured when L.K.S.R. hit him with a toy truck, but later changed her account to claim that L.K.S.R. had pushed Sibling 2 onto the sidewalk. L.K.S.R. told DHS personnel that he witnessed Mother hit and step on Sibling 2, causing him to bleed.

On March 11, 2014, DHS obtained an OPC for N.L.H.R., L.K.S.R., and Sibling 2 and placed them in foster care. On March 25, 2014, N.L.H.R. and L.K.S.R. were adjudicated dependent and committed to DHS custody. Mother was referred for parenting classes and domestic violence counseling and was permitted to have weekly supervised visitation with the Children.

On March 19, 2014, Mother submitted to a psychological evaluation that measured Mother's cognitive function to be at an extremely low range and determined that her verbal and perceptual reasoning skills likely limited her

ability to handle life challenges effectively. The report also noted that Mother's judgment and insight may be compromised when she faces stress.

After an initial permanency hearing on May 29, 2014, Mother was referred for a parenting capacity evaluation (PCE), which was conducted by Dr. William Russell, Ph.D., on September 16, 2014. Dr. Russell noted that Mother's general knowledge and intelligence were limited and observed that Mother displayed erratic emotion, moving through calm, angry, and sad states and returning to a calm demeanor with little provocation. Mother became easily angered when confronted with inconsistencies in her statements and eventually refused to answer certain questions. Based on these observations, Dr. Russell opined that Mother's pattern of denial and distortion, in conjunction with her cognitive limitations, would not allow her to provide safety and permanency for the Children without an increase in Mother's insight and judgment.

On October 2, 2014, Mother agreed to submit to a Family Service Plan (FSP) in which her objectives were to 1) learn and utilize non-violent, non-physical discipline methods, 2) maintain regular visitation with the Children, 3) attend Family School and Achieving Reunification Center (ARC), 4) seek and maintain employment or obtain job training, and 5) comply with a referral for domestic violence counseling and Intellectual Disability Services (IDS). Thereafter, the lower court consistently held permanency review hearings at which Mother was found to be moderately compliant with her FSP objectives, but Mother failed to attend several of the permanency hearings. Although

Mother was permitted to progress to having unsupervised visitation with the Children, the trial court subsequently restricted Mother to supervised visits after learning of Mother's inappropriate behavior with the Children during unsupervised visits.

On September 27, 2016, Mother submitted to a second parenting capacity evaluation (PCE) by Dr. Russell, who noted Mother continued to minimize the impact of her unhealthy behavior on the Children and did not take responsibility for her role in the Children's placement with DHS. Psychological testing confirmed Mother's unsophisticated denial of any negative behavior or problems. Dr. Russell observed that Mother's pattern of denial and distortion continued as she did not appreciate the Children's behavioral and mental health difficulties and was unable to comprehend how she would experience increased emotional, physical, and financial stress if the Children were returned to her care. The agency expressed concern after learning Mother threatened to beat one of the children if he did not behave.

Dr. Russell recommended that Mother participate in individual counseling along with a gradual increase of visitation with the Children to determine if Mother can effectively handle the stress of carrying for the Children. In addition, Dr. Russell suggested that Mother be given assistance in creating a budget that would allow her to care for her family.

On June 1, 2017, DHS filed petitions to terminate Mother's parental rights to the Children and to change the Children's permanency goal to adoption. On June 20, 2017, the trial court held a combined termination/goal

change hearing. In addition, the trial court continued the case for further testimony given on October 25, 2017. By orders entered October 25, 2017, the trial court involuntarily terminated the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) and changed the Children's goal to adoption.[4] This timely appeal followed.

Mother raises the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (5), and (8)?

B. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Mother's Brief, at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."

---

[4] As Mother did not appeal the change of permanency goal to adoption, we need not address this issue.

>*Id.* The trial court's decision, however, should not be reversed
>merely because the record would support a different result. *Id.*
>at [325-26, 47 A.3d at] 827. We have previously emphasized our
>deference to trial courts that often have first-hand observations of
>the parties spanning multiple hearings. *See In re R.J.T.*, [608
>Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

>Our case law has made clear that under Section 2511, the court
>must engage in a bifurcated process prior to terminating parental
>rights. Initially, the focus is on the conduct of the parent. The
>party seeking termination must prove by clear and convincing
>evidence that the parent's conduct satisfies the statutory grounds
>for termination delineated in Section 2511(a). Only if the court
>determines that the parent's conduct warrants termination of his
>or her parental rights does the court engage in the second part of
>the analysis pursuant to Section 2511(b): determination of the
>needs and welfare of the child under the standard of best interests
>of the child. One major aspect of the needs and welfare analysis
>concerns the nature and status of the emotional bond between
>parent and child, with close attention paid to the effect on the child
>of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination orders pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

> With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

With respect to the grounds for the termination of parental rights under Section 2511(a)(2), this Court has provided the following:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned as follows:

The children have been in care since March 2014. Mother's [FSP] objectives were [to address] mental health [issues], to complete a parental capacity evaluation, attend ARC for parenting and domestic violence, cooperate with IDS, provide proof of employment, and to maintain visits with the [C]hildren. Mother's objectives have been the same for the life of the case and Mother was aware of the objectives.

Mother has claimed that she has been attending individual therapy on a weekly basis but Mother did not provide any documentation about her attendance or progress in any individual therapy program. The last time Mother provided verification of mental health therapy was in February 2016. The CUA case manager indicated that he never received any information on Mother's current mental health provider. Additionally, Mother never signed releases to allow the CUA case manager to receive information on Mother's mental health treatment.

Mother completed the PCE in September 2014 and the supplemental PCE in September 2016, but the findings of both evaluations exposed concerns involving Mother's mental health and parenting capacity. For the concerns relating to mental health, the psychologist indicated that because Mother has an extensive history of sexual abuse, physical abuse, and domestic violence, Mother needs significant individual mental health treatment. After the PCE in 2014, there was no indication that Mother ever followed the psychologist's recommendation to receive the appropriate type of individual treatment. Additionally, the [C]hildren manifest sexual behavior problems and the individual treatment will allow Mother to explore her history and how that history impacts her ability to function. The psychologist indicated that based on the types of trauma Mother has experienced in her life, Mother's mental health concerns cannot be resolved with just a few months of individual therapy.

For the concerns related to Mother's parenting capacity, the psychologist expressed concerns as to Mother's ability to provide safety and permanency for the [C]hildren because Mother has consistently shown a significant amount of denial and

- 10 -

minimization of the problems in her life and the [C]hildren's lives. Mother minimized the impact of her unhealthy behaviors, her role in the [C]hildren's continued placement with DHS, and the [C]hildren's behavioral and mental health difficulties. Mother was unable to grasp how caring for the [C]hildren full time will increase the stress on her emotionally, physically, and financially.

The psychologist showed grave concern regarding Mother's history of physical abuse of the [C]hildren along with the stress of bringing the [C]hildren home. Although Mother completed parenting at the ARC, the psychologist still determined that Mother is not able to provide safety and permanency to the [C]hildren. While on the phone with one of the children, Mother threatened to beat the child if he did not behave.

During the PCE in 2014 and 2016, Mother was administered the Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2"). [FN10] Mother was also administered the Child Abuse Potential Inventory ("CAP") test [FN11] during the PCE in 2016. The results of Mother's MMPI-2 test in both 2014 and 2016 was that there was an invalid profile because Mother failed to give appropriate attention and consideration to the questions. Mother had an un-elevated score on the VRIN but had an extremely elevated score on the lie scale. The absence of substantial elevation on the VRIN together with extreme elevation on the lie scale indicates a naïve and unsophisticated attempt to appear without faults that are typically shared by all, which is why Mother's results were rendered invalid. The results of Mother's CAP test indicated the same pattern of responses by Mother as seen in the MMPI-2. Mother denied any negative behaviors, including typical behaviors that everybody would admit to, to the point that the CAP test was invalid.

[FN10: The MMPI-2 is a psychological assessment that allows the clinician to evaluate the test taker's personal characteristics by comparing the test taker's answers to those given by various psychiatric and non-psychiatric comparison groups. The MMPI-2 is the most researched psychological instrument in existence. The results of the MMPI-2 allow the clinician to make inferences about the patient's typical behaviors and way of thinking. The outcomes of the MMPI-2 allow the clinician to determine the test taker's severity of impairment, outlook on life, approaches to problem solving, typical mood states, likely diagnoses, and potential problems in treatment. The MMPI-

2 uses two scales to assess the test taker. The MMPI uses the Variable Response/Inconsistency Scale ("VRIN") and the True Response Inconsistency Scale, also known as the "lie scale."]

[FN11: The CAP test assists in the screening of physical child abuse cases. The test examines personality traits that are characteristic of individuals who maltreat children, including unrealistic child-rearing attitudes and expectations, anxiety over a child's behavior, problems in interpersonal relationships, feelings of inadequacy, feelings of isolation, inability to handle stress, rigid attitudes, impulsivity, dependency, immaturity, negative childhood experiences including abuse and neglect, and problems in parental relationships. The primary clinical scale is divided into six factor scales measuring distress, rigidity, unhappiness, problems with child and self, problems with family, and problems from others.

Mother completed domestic violence at ARC. Mother was offered IDS in 2014 and at every SCP meeting but Mother repeatedly refused the services offered to her. The trial court ordered Mother to comply with IDS but Mother failed to comply. The psychologist indicated that there was no reason why Mother should have denied IDS.

Mother testified that [she was] employed full-time but she has never provided any form of proof of employment. The psychologist indicated that even though Mother claims she is employed, Mother does not earn enough to support herself and the [C]hildren. Mother has been invited to medical and educational appointments for the [C]hildren, but Mother does not attend.

In 2016, Mother's visits were reduced from weekly supervised and unsupervised to monthly supervised at the agency because of Mother's behavior during the unsupervised visits. During the unsupervised visits, Mother would tell the [C]hildren that they would return to Mother's home permanently. Following the unsupervised visits, the [C]hildren would exhibit behavioral problems in school and the [C]hildren did not exhibit this behavior immediately before the unsupervised visits with Mother.

At the same time, Mother's visits were changed back to supervised at the agency because Mother was unable to supervise the [C]hildren appropriately during the unsupervised visits. Since Mother's visits were reduced back to supervised, Mother has attended all scheduled supervised visits at the agency with the [C]hildren but Mother does not appropriately engage with the [C]hildren at the visits. Mother has brought up inappropriate topics with the [C]hildren and the visitation coach would have to redirect Mother towards a more appropriate conversation. Mother struggles with giving both children attention. Typically, she will engage with one child while the other child plays on the phone. If both children try to get her attention simultaneously, Mother appears frustrated. Additionally, Mother will use her phone during the visits and not pay attention to the [C]hildren.

Trial Court Opinion (T.C.O.), 2/2/18, at 10-13 (citations omitted and paragraph divided for ease of review).

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that, despite completion of some her FSP objectives, Mother failed to take responsibility for and appreciate the reasons the Children came into care and her role related thereto and lacked a protective capacity. At the termination hearing, Mother continued to maintain that she did "not physically beat" the Children and accused the Children of lying about the abuse. N.T. 6/20/17, at 52-53. As emphasized by the trial court, Mother minimizes the behavioral and emotional problems she and the Children face and cannot comprehend the significant difficulty she would face if the Children were returned to her care. Mother has refused to participate in individual therapy to address her own extensive history of sexual and physical abuse.

Accordingly, we find the record substantiates the trial court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. ***See In re Adoption of M.E.P.***, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. ***See id***. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa.Super. 2006).

As we discern no abuse of discretion or error of law, we do not disturb the trial court's finding that grounds for termination exist under Section 2511(a)(2). As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). ***In re B.L.W.***, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa.Super. 2012). In ***In re E.M. [a/k/a  E.W.C. &***

- 14 -

> *L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Mother's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

> In 2016, Mother's visits were reduced from weekly supervised and unsupervised to monthly supervised at the agency because of Mother's behavior during the unsupervised visits. During the unsupervised visits, Mother would tell the children that they would return to Mother's home permanently. Following the unsupervised visits, the children would exhibit behavioral problems in school and the children did not exhibit this behavior immediately before the unsupervised visits with Mother.
>
> ***
>
> The [C]hildren did not have any problem separating from Mother at the end of visits. The CUA case manager has invited Mother to medical and educational appointments for the [C]hildren but she has never attended any of the appointments. Mother never expressed an interest in medical appointments or educational services for the [C]hildren to the visitation coach. The children would not suffer any irreparable harm if Mother's rights were terminated. The children do not have a healthy, positive, parental bond with Mother.
>
> It is in the [C]hildren's best interest to be adopted by their respective foster parents. Both children are currently placed in loving foster homes and are thriving in their placements. [N.L.H.R.] has a very strong relationship with the foster parent and looks to the foster parent as the parental caregiver. The foster parent always involves [N.L.H.R.] in family parties and gatherings. [N.L.H.R.] is accepted by the entire foster family as part of their own. It is in [N.L.H.R.'s] best interest to be adopted. The foster parent is a pre-adoptive resource. [N.L.H.R.'s] Court-Appointed Special Advocate testified that [N.L.H.R.] wants to stay with the foster parent and [N.L.H.R.] would be harmed if removed from her pre-adoptive home. [N.L.H.R.] is surrounded by love.
>
> [L.K.S.R.] has a strong bond with his foster parent. The foster parent provides [L.K.S.R.] with everything he needs to sustain and grow. [L.K.S.R.] is progressing in school and actively participates in after-school sports. Additionally, [L.K.S.R.] asked to have the same last name as the two other children that live in

- 16 -

the foster parent's home. The foster parent has helped [L.K.S.R.] become more outgoing and verbal. The CUA case manager indicated that removing [L.K.S.R.] from the foster home would be very upsetting to [L.K.S.R.]. It is in [L.K.S.R.'s] best interest to be adopted. This foster parent is a pre-adoptive resource.

T.C.O. at 22-23. (citations omitted and paragraph divided for ease of review).

Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, the Children had already been in DHS care for over three and a half years, and are entitled permanency and stability. Mother was given many opportunities, almost to the point of the Children's safety being compromised by being subject to her abusive behavior over a period of time, to change her behavior.

As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Based on the foregoing analysis, we conclude that the trial court did not err in terminating Mother's parental rights under Sections 2511(a)(2) and (b) of the Adoption Act.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/18